UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiffs,<br><br>v.<br><br>ANDREW OCANAS GARZA,<br><br>    Defendant. | No. 5:21-CR-120-H-BQ-1 |

## MEMORANDUM OPINION AND ORDER

Defendant Andrew Ocanas Garza asks the Court to suppress one unmirandized statement made by him during a warranted search of his house. Officers asked if there were any firearms in the house, and he said there was. At the time of the statement, Garza and his wife Cassandra Ortiz—the two known occupants—had already been detained outside the house, and officers were entering the house to sweep it for other occupants or dangerous conditions. But, in the five minutes leading up to Ortiz stepping out of the front door, she did not answer repeated phone calls by the officers, and officers were constantly covering the house with firearms preparing to react to a potential active shooter inside the house. Prior to the search operation, the officers were briefed regarding Garza's history of violent crimes and the large amounts of narcotics and cash linked to Garza. Based on this information, the Court finds that the officers had an objectively reasonable safety concern at the time of the statement. The totality of the evidence, including credible testimony from officers at the scene and body-camera footage, demonstrates that the immediacy of a potentially volatile situation that posed a danger to the officers, the arrestees, and the public had not passed when Garza gave his statement. Therefore, the Court finds that the public-safety exception to *Miranda* applies and denies Garza's Motion to Suppress (Dkt. No. 58).

1.  **Factual and Procedural Background**

    A.  **Factual Background**

On September 14, 2021, Judge Bryant issued a search warrant of Garza's residence. Dkt. No. 42-1. And on September 16, law enforcement executed the search warrant. Dkt. No. 58-1 at 1–2 (DEA Report). Upon arriving at the house, officers found Garza backing his truck into the driveway. *Id.* This is when Deputy Macias arrived on the scene, and his body-camera footage helps fill in the details of the events leading up to and after Garza's statement. Gov. Ex. B (body-camera footage). Immediately upon arrival, Deputy Macias exited his vehicle, drew his gun, and ordered Garza to exit his truck, which was parked in the driveway. Gov. Ex. B at 00:45–55. While handcuffing Garza, who was prone on the ground, Deputy Macias asked Garza, "Who else in the house?" *Id.* at 01:12–13. Garza responded, "my girlfriend." *Id.* at 01:13–14. Simultaneously, another officer with a rifle trained at the house positioned himself between the detaining officers and the house. *Id.* at 1:05–15. Shortly thereafter, another officer drew his pistol and joined the officer who was armed with a rifle and covering the house. *Id.* at 1:30–40.

After the officers helped Garza up from the ground, officers noted that Garza's wife[1] was in the house and requested keys from Garza to access the residence. *Id.* at 01:30–40. Garza responded that his house is unlocked. *Id.* at 01:38–41. At this point, Garza told the officers that his dogs are in the house and asked the officers, "Don't kill my dogs this time." *Id.* at 01:39–43. Officers then tried to call Garza's wife and simultaneously moved Garza in

---

[1] Although Garza refers to his wife as his girlfriend (Gov. Ex. B at 01:13–14) and the search-warrant affidavit refers to her as his "paramour" (Dkt. No. 42-1), the Court confirmed at the hearing that she is his wife.

front of his truck, putting the truck between him and the house to provide cover. *Id.* at 01:43–02:08.

Officers continued to try to call Garza's wife, Cassandra Ortiz, numerous times, but she did not answer. Gov. Ex. B at 2:25–5:30. Garza again expressed concern for his dogs, stating, "They got killed last time, I don't want them killed." *Id.* at 2:25–33. Garza informed the officers that he has a shih tzu and two pitbull dogs in the house. *Id.* at 2:33–35. As the officers called a third time, agents noted that they saw some movement in the house through a window, and Garza responded, "My dogs are right there, sir." *Id.* at 03:08–13. Officers confirmed that the movement in the window were the dogs and not Garza's wife. *Id.* at 03:30–33. An officer then asked Garza if he has any guns in the house she could access, and Garza responded, "No sir." *Id.* at 03:35–39. After failing to contact Ortiz by phone, officers approached the door with Garza. *Id.* at 04:45–05:10. By that time, five officers in the breach team had drawn up to the front of the house, and at least three officers had their firearms drawn toward the windows and doors. *Id.* at 4:34–42. As Garza was led up to the front of the house, two members of the breach team approached the front door with weapons drawn. *Id.* at 4:44–56.

At the front door, officers asked Garza if Ortiz could secure the dogs in a kennel before the officers attempted to make entry, and Garza answered that she could put them in the backyard. *Id.* at 5:00–5:11. At this time, Garza informed the officers that only his wife and dogs were in the house. *Id.* at 05:12–26. Garza also told the officers that his dogs would be aggressive when they saw the officers. *Id.* at 5:24–28. Eventually, officers knocked on the front door, and Garza was escorted away from the door to the side of the house by the driveway. *Id.* at 05:30–53. Ortiz answered the door, and she too was escorted

to the side of the residence. *Id.* at 05:54–06:03. Ortiz informed the officers that her pitbulls were outside in the backyard and that only her little dog and nobody else was in the house. *Id.* at 05:59–06:09.

The following events surrounding the statement at issue were not captured on Deputy Macias's body-camera but were derived from Agent Cumberland's testimony and the DEA report. Defense counsel did not bring forth any evidence to counter this account. Agent Cumberland and Deputy Macias testified that Ortiz and Garza were moved over to the side of the house accompanied by himself and Special Agent Suarez. Tr. at 19, 31, 60–61, 67. As the breach-team officers entered the house to conduct a protective sweep, Agent Suarez asked Garza if there was a firearm in the house, and Garza "advised that there was a small firearm in the master bedroom." Dkt. No. 58-1 at 2; Tr. at 75. This is the statement at issue, and Garza was not mirandized at that point. Agent Suarez then stepped in front of the doorway and informed the breach team that there was a pistol on the dresser in the bedroom. Tr. at 69–70.

Simultaneously, the breach team—including Deputy Macias—entered the residence to ensure that there were no occupants inside. Gov. Ex. B at 06:25–30. The body-camera footage makes clear that the breach team was sweeping the premises to make sure there were no people hidden within the house. *Id.* at 6:25–9:55. During the primary sweep of the residence, officers checked obvious areas where a person may be hiding. *Id.* at 6:25–7:31. At all times, their guns were drawn and pointed toward areas where hidden occupants may lie. *Id.* The officers then transitioned to a secondary sweep of the residence to examine smaller and less obvious places where a person could hide, including cabinets and attic hatches. *Id.* at 7:32–9:55. During the secondary sweep, an officer noted that there was a

firearm on the dresser. *Id.* at 8:39–42. After this, Deputy Macias informed the search team that the residence has been secured. *Id.* at 09:55–56.

The search team then entered the residence to search the premises. Dkt. No. 58-1 at 2. "Upon conducting a search of the master bedroom," officers located an unloaded handgun "in plain view on a dresser on the south side of the room." *Id.* at 2–3.

### B. Procedural Background

After Garza's new counsel filed the present motion to suppress (Dkt. No. 58), the Court held a suppression hearing. Dkt. No. 66. Garza's motion to suppress only requests the exclusion of the unmirandized statement he made to Agent Suarez about the firearm and nothing else. Dkt. No. 58. In response, the government concedes that the statement was unmirandized but argues that the public-safety exception applies. Dkt. No. 60. The motion is ripe for resolution.

## 2. Legal Standards

### A. Motion to Suppress

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). "The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts." *United States v. Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016). The judge must "weigh the evidence and make credibility determinations regarding conflicting testimony." *Id.*

### B. Miranda and the Public-Safety Exception

"In *Miranda*, the Supreme Court held that, in order to preserve the privilege against self-incrimination, law enforcement officials must inform a suspect in custody of his right to

remain silent, that any statement he makes may be used as evidence against him, and that he has a right to retained or appointed counsel." *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* warnings apply only where a defendant is subjected to custodial interrogation, and the warnings must be given prior to the custodial interrogation. *United States v. Lim*, 897 F.3d 673, 690 (5th Cir. 2018). "Generally, statements obtained during a custodial interrogation without providing adequate warnings under Miranda are inadmissible." *Courtney*, 463 F.3d at 336.

Under the public-safety exception, however, an unmirandized statement is admissible when "a situation posing a threat to the public safety" existed at the time of the statement. *Lim*, 897 F.3d at 690 (citing *United States v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006)). "This exception is a 'narrow exception' which in each case is 'circumscribed by the exigency which justifies it.'" *Brathwaite*, 458 F.3d at 382 n.8 (quoting *New York v. Quarles*, 467 U.S. 649, 658 (1984)). "The public safety exception archetypically applies in those situations in which law enforcement is confronted with an on-going conflict, arrest, or other volatile situation." *United States v. Green*, 388 F. App'x 375, 379 (5th Cir. 2010). "The exception exists to permit law enforcement to neutralize any immediate or lingering danger to themselves or to the public." *Id.* "When the danger inherent in a confrontation has passed, so has the basis for the exception." *Fleming v. Collins*, 954 F.2d 1109, 1114 (5th Cir. 1992).

In the seminal case establishing the exception, the Supreme Court suggested that the exception would apply where the questions giving rise to the unmirandized statement related to "an objectively reasonable need to protect the police or the public from any immediate danger." *Quarles*, 467 U.S. at 659 n.8. Following this guidance, Fifth Circuit

courts have used an objective, totality-of-the-circumstances approach in evaluating whether a situation posing an immediate and ongoing threat to the public or officers' safety existed. *See, e.g.*, *United States v. Kelley*, No. C-06-782, 2007 WL 704015, at *3 (S.D. Tex. Mar. 2, 2007), *aff'd*, 268 F. App'x 304 (5th Cir. 2008); *United States v. Zamora*, No. 2:06-CR-20089-014, 2009 WL 995032, at *2–3 (W.D. La. Apr. 9, 2009). Courts consider a variety of factors in evaluating objectively reasonable need, including:

- whether the defendant and other occupants of the premises to be searched were detained (*see Brathwaite*, 458 F.3d at 382 n.8);

- whether they were detained outside of the premises and fully within the officers' control (*see Lim*, 897 F.3d at 691);

- whether protective sweeps of the premises were already completed (*see Brathwaite*, 458 F.3d at 382 n.8);

- whether officers had encountered resistance or other dangers (*see Kelley*, 2007 WL 704015, at *3; *Fleming*, 954 F.2d at 1113);

- whether the officers had any prior information that there were firearms or other dangers inside the premises (*Kelley*, 2007 WL 704015, at *3);

- whether officers entered the premises peaceably (*see Lim,* 897 F.3d at 691; *Kelley*, 2007 WL 704015, at *3);

- whether the public had access to the premises (*see Brathwaite*, 458 F.3d at 382 n.8);

- the length of time officers had to provide *Miranda* warnings, taking into account the exigency of circumstances (*see Lim,* 897 F.3d at 691);

- whether the officers had an objectively reasonable concern for their or the public's safety (*see Lim,* 897 F.3d at 691; *Fleming*, 954 F.2d at 1113; *Kelley*, 2007 WL 704015, at *3).

3. Analysis

The DEA report states that Garza was "detained" when Agent Suarez asked him "if there were any weapons inside of the residence." Dkt. No. 58-1 at 2; *see also* Gov. Ex. B at 00:45–01:30 (officers handcuffing Garza). And neither party contests that Garza was

subjected to an unmirandized custodial interrogation. *See* Dkt. Nos. 58 at 4; 60. The only dispute concerns whether the public-safety exception applies. In briefing and at the hearing, the government primarily relied on *Kelley*, while defense counsel on *Lim*. 268 F. App'x 304; 897 F.3d 673. Thus, the Court will discuss both cases and explain that Garza's case, while it lies between *Kelley* and *Lim* in terms of exigency, falls within the public-safety exception.

> **A.    The government expands the import of *Kelley* beyond its text, and the facts of that case involved a greater threat to safety than present here.**
>
> > **i.    *Kelley* does not establish a bright-line rule that, where known occupants have been detained but a protective sweep is ongoing, the public-safety exception applies.**

Where "occupants were handcuffed" and officers had completed two protective sweeps of the premises subject to search, the Fifth Circuit held in *Braithwaite* that the public-safety exception did not apply because the "immediacy of the situation had passed." 458 F.3d at 382 n.8. But, in *Kelley*, the Fifth Circuit held that the exception applied where occupants had been detained but a protective sweep was ongoing. *Kelley*, 268 F. App'x 304.

The government primarily relies on *Kelley*—an unpublished Fifth Circuit opinion—to imply that where known occupants of a premises have been detained but a protective sweep is ongoing, the public-safety exception always applies. *See* Dkt. No. 60 at 5–7. *Kelley* was a summary opinion and stated no such categorical rule. *Kelley*, 268 F. App'x 304. "[T]he application of the public safety exception is fact-specific, necessitates flexibility, and is essentially, 'a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case.'" *United States v. Nelson*, 489 F. Supp. 2d 309, 315 (S.D.N.Y. 2007) (quoting *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005)). A bright-line rule is inapposite in this context because this exception is heavily fact-dependent.

Furthermore, an examination of the underlying district court opinion in *Kelley* reveals facts that highlight the exigency of the situation: The district court in *Kelley* applied the public-safety exception based on facts indicating a threat to safety beyond the incompletion of a protective sweep. "All of the[] events" from the "officer's entry into the home" to the defendant's statement "occurred within sixty seconds." *Kelley*, 2007 WL 704015, at *3. Moreover, there were many other facts adding to the exigency of the situation. It was dark when officers executed the search and arrest warrant on Kelley and his residence. *Id.* And as officers attempted to enter the house, they encountered resistance from his nephew "who tried to prevent police from entering the residence." *Id.* Officers had to break in the door to enter and subdue the nephew. *Id.*

Upon entering, officers immediately saw a gun in plain view and, as they proceeded inside the house, they discovered Kelley and a woman in a bedroom, as well as another gun in plain view on the bed. *Id.* As other officers were completing a security sweep of the home, an officer asked the defendant about any other guns in the house, and the defendant then made his statement. *Id.* After recounting the facts, the court also noted that a confidential informant had seen the defendant dealing drugs with guns in his possession at the residence on prior occasions. *Id.* "Given the objective circumstances of the case, with the confidential informant's information regarding Defendant's drug dealing and gun possession, as well as the possibility of other persons in the house with access to weapons," the Court found "it was reasonable for [the questioning officer] to be concerned for his own safety and those of the other officers." *Id.*

So, in *Kelley*, there were many other factors besides the fact that a protective sweep was not completed that led the district court to apply the public-safety exception. The Fifth

Circuit affirmed this decision based on the questioning officer's "concern about the safety of the officers on the scene" and the fact that officers had not "completed a protective sweep of the residence." *Kelley*, 268 F. App'x 304. Thus, the Fifth Circuit did not state a bright-line rule that the public-safety exception applies where known occupants have been detained, but a protective sweep is ongoing.

### ii. The exigency of the situation here was less than in *Kelley*.

Unlike in *Kelley*, the search on Garza's residence took place during the day. There was no violent resistance to the officers entering the house, and the front entrance was sealed from public access. Moreover, Garza was detained without incident outside of the house and was under the officer's control when officers asked him about other occupants or guns in the house. Five minutes later, Ortiz was also detained outside the house. And five minutes and forty seconds after Garza's arrest, as the officers entered the house to sweep it, Garza gave his statement. These circumstances demonstrate that a lesser threat to public safety existed in Garza's case than in *Kelley*.

In *Kelley*, "[a]ll of the[] events" from the "officer's entry into the home" to the defendant's statement "occurred within sixty seconds." 2007 WL 704015, at *3. And the length of time officers had to provide *Miranda* warnings plays a part in assessing the exigency of a situation for purposes of the public-safety exception. *See Lim,* 897 F.3d at 691. Defense counsel noted that the relevant time period the officers had to provide *Miranda* warnings is the approximately six minutes between Garza's arrest and the statement. Tr. at 71, 84. But this time, while comparatively lengthy, does not reflect the inherent uncertainty in the period leading up to the statement and especially in the five minutes until Ortiz exited the residence. This will be discussed further in Section C.

### B. *Lim* delineates the contours of when the public-safety exception does not apply, but it is distinguishable.

At the suppression hearing, defense counsel primarily analogized this case to *Lim*—in which the Fifth Circuit reversed a district court's application of the public-safety exception—to argue that the public-safety exception does not apply. Tr. at 82–83, 87; *Lim*, 897 F.3d 673. In *Lim*, immigration officers arrived at Lim's mobile-home residence at 6 a.m. to execute a warrant of removal. *Lim*, 897 F.3d at 679, 685 & n.21. Officers knocked on the door, Lim answered undressed, and officers handcuffed him outside. *Id.* at 685. "The officers offered to allow Lim to return inside to dress, but explained that they would have to accompany him inside if he did so. Lim assented." *Id.* At this point, the officers' and Lim's accounts diverge.

"According to Lim, once inside, he was immediately asked whether there were any weapons in the house" and, simultaneously, "another officer was performing a security sweep of the house, and Lim's wife and teenage children were sequestered in the living room." *Id.* Lim then gave his statement about two guns. *Id.* But according to the government, upon entering the house, officers spotted Lim's wife but had not sequestered the children when officers questioned Lim and he gave his statement. *Id.* at 686. The questioning officer "wanted to make sure that there were no additional people coming out of rooms to surprise [them]." *Id.* And "[t]he officers were unsure whether the security sweep had been concluded in the rest of the house before they entered the bedroom, but they knew a sweep had not yet been conducted of the bedroom." *Id.* Officers then accompanied Lim to the bedroom and recovered the gun. *Id.*

Despite the factual dispute about whether the other non-defendant occupants were secured and the fact that "the officers either were in the process of conducting a protective

– 11 –

sweep or had not yet performed one when Lim was questioned," the Fifth Circuit reversed the district court and held the public-safety exception did not apply. *Id.* at 691. In so holding, the court noted that "[t]here was no concern for the general safety of the public, given that the public did not have access to Lim's residence, and no violent crime had immediately preceded the arrest." *Id.* The "best theory for application of the public safety exception thus rest[ed] on concern for the officer's own safety." *Id.*

A cursory juxtaposition shows that the facts of *Lim* at least partially resemble Garza's case. But a closer examination of the underlying facts indicates that Garza's case falls within the inner bounds of the public-safety exception whereas *Lim* does not. Just as in *Lim*, officers had "formally arrested" Garza and Ortiz outside the residence, so they were "fully within [the officer's] control." *Id.* Garza informed the officers that his house was unlocked and accompanied them to the front door so that they could make entry peacefully. Gov. Ex. B at 01:38–41, 04:45–05:10; *see Lim*, 897 F.3d at 691 ("The officers and Lim then jointly agreed to enter the home."). Several armed officers had sealed the front of Garza's house, restricting access from the public. And in both *Lim* and here, there was uncertainty as to whether there were other occupants in the house.

But in *Lim*, immigration officers were executing a warrant of removal for an undocumented person rather than a search warrant on the residence of a suspected high-volume narcotics trafficker. *Lim*, 897 F.3d at 679. The immigration officers had no information that Lim or his family were dangerous or that illicit activities—other than Lim's unlawful presence—were being conducted in the house. Here, on the other hand, all officers were briefed about Garza's drug-trafficking activities, the large amount of cash and drugs suspected to be in the residence, and his prior history of violent crimes. Garza's

police encounter, therefore, began with a higher level of risk, and the tension underlying the search and arrest is corroborated by the officers' actions in Deputy Macias's body-camera footage.

The fact that Lim's teenage children might not have been secured is a factor that adds to the volatility of the situation in *Lim*. But this fact was disputed. *See id.* at 685. Moreover, the officers were at Lim's mobile home at 6 a.m. and, based on Lim's undressed state, the teenage children were likely asleep and awoken by the immigration officers. *Id.* Teenagers waking up might be cranky but are generally not safety threats. By contrast, the officers here approached Garza's residence in broad daylight, and Ortiz's failure to respond to the officers' repeated phone calls heightened the risk that the officers may be ambushed or take gunfire from inside the house. Furthermore, Lim's house was a mobile home, which tends to be smaller than a regular house, and was smaller than Garza's full-sized house. *Id.* at 685 n.21. A mobile home has fewer places to hide, and several officers were already inside searching the premises. *Id.* at 685. In other words, the immigration officers in *Lim* had a much greater grasp of the situation inside the premises than did the officers in Garza.

All of these factors indicate that the safety threat was greater here than in *Lim*. So Garza's case lies between *Kelley* and *Lim* in terms of exigency. Therefore, a further analysis of the facts is needed to determine whether the officers had "an objectively reasonable need to protect the police or the public from any immediate danger." *Quarles*, 467 U.S. at 659 n.8.

### C. Garza's statement falls within the public-safety exception.

#### i. Even after Garza's arrest, the situation remained volatile.

Before the search operation on Garza's house, officers were briefed that Garza had a history of violent crimes and that he was suspected of trafficking a large amount of narcotics and cash. Tr. at 50, 53–55. Much of Garza's alleged high-volume drug-trafficking activities are documented in Agent Cumberland's affidavit accompanying the search-warrant application. Dkt. No. 64-1 at 1 (Gov. Ex. A). Based on his training and experience, Agent Cumberland testified that drug traffickers frequently possessed firearms within their residence to protect their drugs and drug proceeds. *Id.* at 4–5; Tr. at 56. Coupled with Garza's history of violent crimes and the lack of knowledge about other occupants in Garza's house, the situation was fraught with danger from the moment when the officers first approached the residence.

To be sure, the danger subsided to a degree when Garza was apprehended. But based on Garza's representations and the officers' actions after the arrest, it is obvious that the "immediacy of the situation had [not] passed." *Brathwaite*, 458 F.3d at 382 n.8. Shortly after Garza got on the ground, two officers covered the scene of arrest with their firearms pointed at the house. Gov. Ex. B at 01:05–40. As Garza was handcuffed, officers asked Garza about other occupants of the house, and Garza told them Ortiz was in the house. *Id.* at 01:12–14. Simultaneously, two officers with bulletproof vests moved between in front of the scene of arrest and began covering the house with their firearms. *Id.* at 1:06–40. Officers then tried unsuccessfully to call Garza's wife and simultaneously moved Garza in front of his truck, putting the truck between him and the house. *Id.* at 01:43–02:08. At the suppression hearing, Deputy Macias and Special Agent Cumberland—who were handling

Garza together—said the officers performed these maneuvers to protect Garza and the officers against potential fire from an active shooter within the house. Tr. at 10–11, 13–14, 18–19, 60–61.

Additionally, on two separate occasions, Garza told the officers, "Don't kill my dogs this time," and "They got killed last time, I don't want them killed." Gov. Ex. B at 01:39–43; 02:25–33. This signaled to the officers that Garza may have had a prior violent confrontation with law enforcement in which his dogs were killed, alerting the officers that Garza or people associated with him may pose a danger. Deputy Macias testified that, though he did not know of the former incident when Garza's dogs were killed, the dogs also posed a potential threat to the officers. Tr. at 18–19. And these were not just any dogs; Garza told the officers he had two pitbulls—a breed well known to attack aggressors and able to cause serious injury. Gov. Ex. B at 2:33–35. Moreover, Garza later told the officers that the dogs would be aggressive when they saw the officers. *Id.* at 5:24–28.[2]

About three minutes before the statement at issue and after Garza's arrest, an officer asked Garza if he had any guns in the house that Ortiz could access, and Garza responded, "No sir." *Id.* at 03:35–39. Of course, the officers were not required to credit Garza's response and, at the hearing, Deputy Macias testified that it is not uncommon for detainees to lie about weapons or others being present in a premises. Tr. at 22–23. The pistol that was eventually discovered on top of Garza's bedroom dresser confirms Deputy Macias's experience and Garza's lack of credibility at that moment.

---

[2] To be sure, the presence of dangerous dogs do not relate directly to the danger posed by other occupants or firearms. But such dogs may add to the volatility of a situation.

    **ii.**  **Officers failed to reach Ortiz by phone after calling her numerous times, which added to the uncertainty of the situation.**

  Shortly after Garza's arrest, officers tried to call Ortiz numerous times, but she did not answer. Gov. Ex. B at 2:25–5:30. Officers detected movement in the windows that were likely from the dogs, but Ortiz was nowhere to be seen. *Id.* at 03:08–33. Deputy Macias and Agent Cumberland testified that, based on Ortiz's lack of response to their calls, the officers suspected that Ortiz or other occupants were destroying evidence of crimes or setting up an ambush against the officers. Tr. at 21, 58–59. Deputy Macias also testified that the officers were short-handed that day. *Id.* at 14. According to Deputy Macias, a narcotics-search operation on a house the size of Garza's would involve 12 to 15 officers; they had no more than 10. *Id.* at 14–15. The officers were constantly concerned about an active shooter firing from within the house. *Id.* at 19–20, 43–44. As the breach-team officers positioned themselves flush against the house, they had their firearms pointed at the windows and doors—prepared to react to any danger from within. Gov. Ex. B at 4:34–56. The circumstances demonstrate that the officers were "confronted with an on-going conflict" and a "volatile situation." *Green*, 388 F. App'x at 379.

    **iii.**  **After Ortiz stepped out, the exigency of the situation had not passed.**

  Ortiz opened the front door and stepped out of the house at timestamp 06:03 on Deputy Macias's body-camera footage. Gov. Ex. B at 05:54–06:05. Ortiz informed the officers that her pitbulls were in the backyard and that only her little dog and nobody else was in the house. *Id.* at 05:59–06:09. Again, the officers were not required to credit these statements, but the situation deescalated to a degree because the other known occupant of the house—Ortiz—was finally detained. Still, the next 25 to 30 seconds leading up to

Garza's statement and the breach team's entry demonstrates that the threat to public safety and the immediacy of the situation had not dissipated. The possibility of an active shooter within the house continued to pose a threat to the officers, the arrestees, and the public, and the body-camera footage and officer testimony show that the officers acted accordingly.[3]

Body-camera footage first shows officers moving Garza in front of the truck to shield him from fire—well before Ortiz was apprehended. Gov. Ex. B at 01:43–02:08. And after the officers approached the house with Garza in an attempt to reach Ortiz through the door, officers moved Garza to the side of the house where there were no windows. *Id.* at 05:30–53. Deputy Macias and Agent Cumberland testified that they positioned Garza there to protect him from potential cross-fire. Tr. at 19, 31, 43–44, 60–61, 67. After Ortiz stepped out, she was also escorted to the side of the house for the same reasons. *Id.* at 31. All officers continued to post up at the windows and doors with their weapons drawn to react to a potential combatant. Gov. Ex. B at 6:00–20. Simultaneously, an armed officer peered through the side of the window. *Id.* at 6:15–20. Clearly, the officers were still on alert for the presence of armed combatants inside the house around the time that Garza made his statement.

---

[3] Defense counsel maintains that the situation surrounding Garza's statement only posed a threat to the safety of officers. And indeed the DEA Report states that Agent Suarez asked him about the gun, "for the safety of investigators." Dkt. No. 58-1 at 2. However, Deputy Macias and Agent Cumberland testified that there was a possibility that an active shooter would fire a weapon from inside the house. Per Deputy Macias, bullets can pierce through walls or windows. Tr. at 44. So the fact that the house was sealed from public access does not foreclose the possibility of a danger to the public. Moreover, the threat to public safety was greater because the search happened in a residential neighborhood. All of these factors indicate that there was a threat to the officers, the arrestees, and the public at large. The officers' conduct confirms that this threat existed.

### iv. Under these circumstances, the statement related to an objectively reasonable need to protect the officers and the public.

An "objectively reasonable need to protect the police or the public from any immediate danger" is inherently difficult to assess from the bench—detached from the actual circumstances. *Quarles*, 467 U.S. at 659 n.8. But courts are cautioned against second-guessing the safety-risk perception of officers on the scene when performing the objective-reasonability analysis in the Fourth Amendment context. *See, e.g.*, *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("[J]udges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."); *Romero v. City of Grapevine*, 888 F.3d 170, 177 (5th Cir. 2018). And reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Nothing indicates that the objective-reasonability analysis is more scrutinizing in the Fifth Amendment and public-safety exception context. *Cf. Fleming*, 954 F.2d at 1113 (critiquing the panel majority's reliance on hindsight).

As defense counsel suggested, narcotics-search operations of this type always come with some degree of general uncertainty about the possibility of unknown occupants or combatants. *See* Tr. at 33, 80, 86. But here, objective circumstances demonstrate that the officers faced more than a general uncertainty posing a public-safety risk. The length of time during which Ortiz did not answer the phone, suspicions that Garza may have had violent encounters with the police on prior occasions, and the large amounts of drugs and cash associated with him heightened the uncertainty regarding firearms and other occupants within the house.

The officers' actions corroborate this reality. Based on the officers' maneuvers to protect the arrestees, themselves, and the public against an active shooter, the Court finds that the officers on the scene perceived a bona fide threat to officer and public safety. Both witnesses—Deputy Macias and Agent Cumberland—credibly testified that, despite their being trained to mirandize a detainee upon arrest, the officers perceived that ensuring public and officer safety by securing the residence was an immediate necessity. Tr. at 39, 42–44, 61–62, 74. Additionally, the body-camera footage, testimony, search warrant, and search-warrant affidavit make clear that the officers' stated concern for their safety was in good faith and not an excuse or pretext to interrogate the defendant before giving *Miranda* warnings. The officers asked Garza and Ortiz no other questions other than those relating directly to safety about other occupants, the location of the pitbulls, and weapons.

 It was reasonable for the officers to first address the immediate need of securing the premises before turning to the next phases of the investigation: search, arrest, and interrogation. And this accords with the policy behind the public-safety exception: "The exception exists to permit law enforcement to neutralize any immediate or lingering danger to themselves or to the public." *Green*, 388 F. App'x at 379. The uncertainty regarding other occupants in the house—combined with the suspected presence of firearms in the house—indicates that a potentially "volatile situation" posing a threat to the officers' safety existed. *Lim*, 897 F.3d at 691.

At several points during the hearing, defense counsel suggested that the possible presence of firearms in the house did not impact the protective sweep the breach team conducted. Tr. at 38–39, 79. But whether the nature of the protective sweep changed by the officers' knowledge of the firearm inside the house is irrelevant to the public-safety-

exception analysis.  The relevant inquiry is whether a situation posing an immediate and ongoing threat to the public or officers' safety existed.  And in any case, Deputy Macias—a member of the breach team—testified that the team conducts a sweep more deliberately if they know a gun is present in a premises.  Tr. at 26, 38, 79.  After Agent Suarez obtained the statement about the gun in the bedroom from Garza, he stepped in front of the doorway and informed the breach team—as they were entering—that there was a pistol on the dresser in the bedroom.  Tr. at 69–70.  Whether this changed the breach team's sweep or not, the body-camera footage shows the officers carefully sweeping the house twice for any possible area where a person could hide.  Gov. Ex. B at 6:25–9:55.  This further supports that the "danger inherent in [the] confrontation" had not "passed" when Garza gave his statement— just as the officers began sweeping the premises.  *Fleming*, 954 F.2d at 1114.

### 4.    Conclusion

For the foregoing reasons, the Court finds that there was "an objectively reasonable need to protect the police or the public from any immediate danger" when Garza gave his statement.  *Quarles*, 467 U.S. at 659 n.8.  Therefore, the public-safety exception applies, and Garza's statement will not be excluded.  The Court denies Garza's Motion to Suppress (Dkt. No. 58).

So ordered on June 21, 2022.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE